HAZARD, The (NATTERSTROM v.). See Case No. 10,055.

HAZARD (PHELAN v.). See Case No. 11,068.

---

## Case No. 6,281.

### HAZARD v. ROBINSON.

[3 Mason, 272.] [1]

Circuit Court, D. Rhode Island. Nov. Term, 1823.

EASEMENT—WATER-COURSE—TWENTY YEARS' POSSESSION.

1. A. owns an upper mill and B. a lower mill on the same stream, with a dam of a height which obstructs the free use of the upper mill. B. lowers his dam two feet, and allows it to remain in that state thirty-eight years, and during that period the upper mill is free of obstruction. B. then sells the lower mill to A., who afterwards sells the lower mill to C. Held, that by the lapse of time and unity of possession the right of raising the dam of the lower mill two feet was gone and that the upper mill had acquired a right to use the water without back-flowing.

[Cited in Whipple v. Cumberland, Case No. 17,516.]

[Cited in Seymour v. Lewis, 2 Beasley [13 N. J. Eq.] 444; Dunklee v. Wilton R. Co., 24 N. H. 499.]

2. Unity of possession does not extinguish the right to use a water-course appurtenant to a mill.

[Cited in Dexter v. Providence Aqueduct Co., Case No. 3,864.]

[Cited in Cary v. Daniels, 5 Metc. (Mass.) 239; Morgan v. Mason, 20 Ohio, 412; Dunklee v. Wilton, R. Co., 24 N. H. 500; Matteson v. Wilbur, 11 R. I. 549.]

3. Twenty years' possession of an easement or use of a water-course is a conclusive presumption of right, if unexplained.

[Followed in U. S. v. Appleton, Case No. 14,463. Cited in Percy v. Parker, Id. 11,010.]

[Cited in Arbuckle v. Ward, 29 Vt. 51; Lampman v. Milks, 21 N. Y. 510; Shields v. Titus, 46 Ohio St. 539, 22 N. E. 717; Webber v. Chapman, 42 N. H. 336.]

Case for obstruction to a mill and flowing back the water by means of a dam across the water-course lower down the stream (called Sauhatucket river) and thereby stopping the operation of the plaintiff's mill. Plea not guilty. At the trial, the facts appeared to be in substance as follows: The mill in ques-

---

1 [Reported by William P. Mason, Esq.]

tion, which for the sake of distinction may be called the upper or Niles's mill, was owned by one Ebenezer Niles in 1735, and sold by him in that year to Daniel M'Loone. In 1744, M'Loone devised the same mill to Thomas Hazard in fee; and afterwards, in 1746, being the owner of lands lying on the same stream and mill privileges nearly through its whole course, by a codicil to his will he gave to Daniel Williams a piece of land on the same stream, and "free liberty of erecting a mill or mills on any part of said river to the westward of said land; and free and full liberty of raising a pond by erecting a dam across said river, which may be sufficient and suitable for carrying of said mills when erected." After the death of the testator, his will and codicil were duly proved, and about the year 1749, the devisee, Daniel Williams, erected the lower mill with a suitable dam across the stream in pursuance of the authority in the will. The other devisee, Thomas Hazard, immediately brought an action for an alleged obstruction to his mill, by building a dam so high for the new or lower mill, and thereby flowing back the water. In this suit the defendant, Stedman, who claimed under Williams, had judgment in his favour. Rowland Hazard became the owner of the upper or Niles's mill before the year 1780; and in the year 1807, he purchased of Daniel Williams and others, the then owners, under the original devisee, the lower, or Williams's mill, thus becoming the owner of both mills. 'n October 1818, Rowland Hazard conveyed a certain parcel of land including the lower or Williams's mill "with all the privileges and appurtenances thereunto belonging," (alleging the premises to be part of the land and mills he purchased of Daniel Williams and others to Christopher Congdon in fee, under whom the defendant [James Robinson], claimed by a deed dated in March 1820. The plaintiff [Isaac P. Hazard] derived title to the upper or Niles's mill by deed from Rowland Hazard in May 1821. The defendant, after this period, raised the height of the dam on the lower or Williams's mill, about two feet, whereby the obstruction to the plaintiff's mill complained of was occasioned. From the year 1780, to the time of the grievance complained of, the dam of the lower mill had always been of the height it was before the two feet were added to it by the defendant in 1821. It was asserted, however, that antecedently to 1780, the dam was of the same height that it was after the defendant's addition. This last fact, however, was in controversy between the parties.

Upon this evidence Hazard and Searle, for plaintiff, contended, that the plaintiff was entitled to recover, even supposing the dam was higher before 1780. 1. Because the discontinuance from that time to the time of the sale to Congdon in 1818, was an extinction of any right to erect a higher dam. 2. Because the unity of possession in Rowland Hazard

destroyed any privilege, adverse to his upper mill.

Hunter and Whipple, for defendant, contended e contra on both points.

THE COURT gave an opinion upon both points in favour of the plaintiff, and a verdict was found for the plaintiff. The defendant moved for a new trial, and the cause stood continued for advisement until the next term (June term, 1824,) when the court having expressed an opinion confirming the former decision, the defendant withdrew the motion, and judgment was entered for the plaintiff. The following was the substance of the opinion.

STORY, Circuit Justice. Upon the facts in this case, two points arise: 1. Whether, assuming that originally the dam of the lower mill was rightfully erected as high as it now is, the subsequent lowering of it two feet in 1780, and keeping it in the same state for thirty-eight years, is not an extinction of the privilege to raise it higher. 2. Whether at all events the unity of possession of both mills in Rowland Hazard, by his purchase in 1807, did not extinguish any privilege appurtenant to one mill, which was injurious to, and disused in respect to, the other.

I will consider both points, because they involve considerations of great practical importance, and have been thought susceptible of no small difficulty. As to the first point: The raising of the dam of the lower mill is proved to have been a great injury and obstruction to the beneficial use and operations of the upper mill. This was the origin of the law suit stated in the evidence; and its termination in favour of the defendant, if it establishes a right in the original devisee, it also establishes the fact, that it was a material diminution of privileges, valuable to the upper mill. For thirty-eight years, that is, ever since the year 1780, the dam has remained two feet lower than it now is, and during all this period the upper mill has enjoyed the privilege of the water without any obstruction whatsoever. No adverse right has been claimed, no adverse use or privilege has been exerted. Now upon this posture of the case, upon the general principle of law, a fair, I might almost say, an irresistible, presumption arises of a grant of this privilege from the owner of the lower mill to the owner of the upper mill. In respect, however, to incorporeal hereditaments and easements, such as ways and water privileges, the rule of law is well established, that an uninterrupted possession and use for twenty years is prima facie and, if unexplained, conclusive, evidence of a right; and under circumstances courts of law will entertain the presumption of a grant, even from a shorter period of enjoyment. The cases are so numerous, so well known, and so direct on this head, that it is unnecessary to refer particularly to them. See cases in Ang. Water-courses, 44; Saunders v. Newman, 1 Barn. & Ald. 258; Balston v. Bensted, 1 Camp. 463; Bealey v. Shaw, 6 East, 208; 12 Ves. 266; Gray v. Bond, 2 Brod. & B. 667; 2 Saund. 175, Williams' note, 2; Hawke v. Bacon, 2 Taunt. 156; Gayetty v. Bethune, 14 Mass. 49; Hoffman v. Savage, 15 Mass. 132; Strout v. Berry, 7 Mass. 385; Phil. Ev. p. 120, c. 7, § 2; Wright v. Howard, 1 Sim. & S. 190, 203. A right thus acquired by user, may in like manner be lost by disuser; in other words the discontinuance of the use for a long period affords a presumption of the extinguishment of the right. Lawrence v. Obee, 3 Camp. 514. See White v. Crawford, 10 Mass. 183. In the present case there is nothing to repel the presumption arising from length of time. It was an open, public, uninterrupted use of the water after the lowering of the dam; it was an important privilege; and if a right could not under such circumstances be acquired by thirty-eight years' enjoyment, it is difficult to conceive to what cases the rule of presumption ought to be applied. My judgment is, that in this case it afforded a conclusive presumption of right.

As to the second point. From the year 1807 to 1818, the time of the conveyance to Congdon, Rowland Hazard was the owner of both mills, and of course of all the rights and privileges appurtenant thereto. In general it is true, that unity of possession of the estate to which an easement is attached and of the estate, which the easement incumbers, in effect is an extinguishment of the easement. 1 Saund. 323, Williams' note, 6; 1 Rolle, Abr. 635, c. pl. 8; Bull. N. P. 74; Poph. 166; 4 Coke, 36; Clements v. Lambert, 1 Taunt. 206. But this doctrine has some exceptions, as for instance, in case of a way of necessity, it is often said, that unity of possession does not extinguish it. The true principle that governs in that case, is this, a way of necessity being ex vi termini indispensable for the beneficial use of the estate, granted, is considered as included in the grant of the estate; for in such case the law gives by implication every thing which is necessary for the enjoyment of the estate. It would perhaps be more correct to say, that in such case the original right of way is suspended or extinguished by the unity of possession, and revived or regranted by necessary implication upon the grant severing the possession. 1 Saund. 323, Williams' note, 6.

Be this as it may, it has been laid down in Bull. N. P. 74, "that a right of watercourse does not seem to be extinguished by unity of possession in any case." For this he cites the case of Surrey v. Piggot, in Latch, 153, and Poph. 166. The case in substance was this: A. was possessed of a rectory, of which a curtilege was parcel. From time immemorial a watering-place for cattle, &c. existed in said curtilege, and a stream had flowed from Milford stream through a piece

of land called the "Hop-Yard" to fill the pond at the watering-place. A. afterwards purchased the hop-yard, and thus became possessed of the rectory and hop-yard at the same time. He then sold the hop-yard to B., under whose title the defendants entered and obstructed the water-course by erecting a stone dam across it within the limits of the hop-yard. The court were unanimously of opinion, that the right to the water-course was not extinguished by the unity of possession; and that the plaintiff was entitled to recover for the obstruction. The case is most fully reported in Popham. Whitlocke, J., said, "that a way or common shall be extinguished, because they are a part of the profits of the land; and the same law is of fishings also; but in our case the water-course doth not begin by consent of parties, nor by prescription, but ex jure naturae, and therefore shall not be extinguished by unity of possession." He took the distinction, that where a thing hath its being by prescription, unity will extinguish it; but where the thing hath its being ex jure naturae, it shall not be extinguished. Jones, J., was of the same opinion for the same reason. Doddridge, J., went into a larger examination of the subject, and held, that the unity of possession did not extinguish the right to the water-course, for two reasons; (1) for the necessity of the thing; (2) for the nature of the thing, being a water-course, which is a thing running. He put the case, "A man owns a mill, and afterwards purchases the land upon which the stream goes, which runs to the mill, and afterwards alienes the mill, the water-course remains." Crew, C. J., concurred in opinion. The same case is reported in Noy, 84; Palmer, 444; Wm. Jones, 145; and 3 Bulst. 339,—but without any essential difference. Upon this case it does not appear to me that there is any difficulty in admitting its entire correctness. It proceeds upon this plain principle, that a privilege which was annexed to, and in actual use with the rectory during the unity of possession, and was not parcel of the other land or a profit à prendre out of that land, was to be considered as still existing as an appurtenance or privilege annexed to the rectory, notwithstanding the unity of possession. The running water over the hop-yard was not parcel of the hop-yard, or an easement growing out of it. But, if during the unity of possession, the privilege had been disannexed by the owner, as if the owner had during that period stopped the water-course and thus destroyed the privilege, the case would have been otherwise. A subsequent grant of the rectory would then have conveyed only the privileges actually in existence and use at the time of the conveyance. This doctrine was admitted by the court in Surrey v. Piggot to be correct, and was adjudged in a case in 11 Hen. VII. 25b, which was on that occasion cited and approved. The case 11 Hen. VII. 25, was as follows: A. was the owner of a tenement, to which there was an ancient gutter running through an adjoining tenement, and afterwards he bought the adjoining tenement; and then sold the first tenement to the plaintiff. It was held, that the ancient gutter was not extinguished by the unity of possession; but that it would have been otherwise, if A. during the unity of possession had destroyed the gutter, or cut it off. The reason is, that it was a necessary and subsisting easement. If, therefore, in the case at bar, the dam of the lower mill had never been lowered, the right to use a dam of that height, notwithstanding the unity of possession, would have passed to the subsequent grantee of the lower mill, as a subsisting privilege or appurtenance upon the doctrine asserted, and correctly asserted, by Doddridge, J. But the dam during the unity of possession and long before had been lowered two feet, and so far as it was an adverse right, had been extinguished in point of use before the unity of possession, and not being revived during that unity, it was extinguished for ever. It did not pass by the grant to Congdon, for nothing passes by a grant of a mill and the privileges and appurtenances thereof, but privileges and appurtenances existing at the time of the grant. In Nicholas v. Chamberlain, Cro. Jac. 121, it was held by all the court, "that if one erect a house and build a conduit thereto in another part of his land and convey water by pipes to the house, and afterwards sell the house with the appurtenances, excepting the land, or sell the land to another, reserving to himself the house, the conduit and pipes pass with the house, because it is necessary and quasi appendant thereto." Here, the unity of possession was not admitted to destroy the right to the easement, because it was annexed to the messuage, and in use at the time of the grant. But if the conduit and pipes had been actually severed before the grant, there could have been no pretence to say that the conduit and pipes passed as appurtenaces. The case of Morris v. Edgington, 3 Taunt. 24, although different in its circumstances, appears to me in its reasoning to warrant this conclusion. Whatever is actually enjoyed with the thing granted, as a beneficial privilege at the time of the grant, passes as parcel of it; but not otherwise.

My opinion on the second point accordingly is, that by the unity of possession, any adverse right of obstruction of the water to the prejudice of the upper mill, in posse, and not in esse, was extinguished; and the grant to Congdon conveyed the lower mill with only such privileges and appurtenances as to the dam and water, as were at that time used and appropriated to it. Judgment accordingly.

HAZARD, The (SINGSTROM v.). See Case No. 12,905.

HAZARD (UNITED STATES v.). See Case No. 15,337.